NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------X

In Re:

WILLIAM HOWARD, III,

                Debtor.

---------------------------------------------------------X

STEPHEN FOGLER & MARSHA FOGLER

                Plaintiffs,

v.

WILLIAM HOWARD, III,

                Defendant.

---------------------------------------------------------X

Order Filed on August 25, 2016
by Clerk U.S. Bankruptcy Court
District of New Jersey

CASE NO. 14-21304 (JNP)

CHAPTER 13

ADV. NO. 14-1770 (JNP)

JUDGE: JERROLD N. POSLUSNY, JR.

## OPINION

**APPEARANCES:**

Stephen M. Fogler, Esq.
Douglas G. Leney, Esq.
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, NJ 08033
*Attorneys for Plaintiffs Stephen & Marsha Fogler*

Chad M. Sherwood, Esq.
Law Office of Chad M Sherwood, LLC
1109 South Main Street
Pleasantville, NJ 08232
*Attorney for Defendant/Debtor, William Howard, III*

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

Honorable Jerrold N. Poslusny, Jr.
United States Bankruptcy Court

**DATED: August 25, 2016**

## INTRODUCTION

Before the Court is the adversary proceeding initiated by Stephen and Marsha Fogler ("Mr. Fogler" and "Mrs. Fogler" or, collectively, the "Foglers") against the Debtor, William Howard, III ("Howard").  The Foglers allege that, in connection with the failed construction of a home pool, Howard is liable for the following Counts: (I) nondischargeability pursuant to § 523(a)(2)(A); (II) nondischargeability pursuant to § 523(a)(6); (III) common law fraud; (IV) violation of New Jersey Consumer Fraud Act; and (V) breach of contract.  Trial was conducted on October 29 and November 5, 2015.  For the reasons explained in this Opinion, the Court finds in favor of Howard on all Counts.  The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[1]

## FACTS & BACKGROUND

Howard is a landscape, hardscape,[2] and more recently, pool contractor.  Howard has been landscaping and hardscaping for a significant amount of time, having started working with his uncle as an adolescent.  In the early-to-mid 1980s, Howard began his own landscape/hardscape company and has been working for himself ever since.  Howard has little official schooling or training, but he has been trained "on the job" for many years.  Oct. 29 Hearing T. 145:11-13.  He has installed over two million square feet of pavers and received multiple awards for both his landscaping and hardscaping.  Oct. 29 Hearing T. 145:23-25; 146:11-22.  He also has been qualified as an expert in hardscaping.  Oct. 9 Hearing T. 146:1-6.  Though he was not necessarily installing pools himself yet, Howard has been doing tile and paver work for pool-installation companies since the 1990s.  Oct. 29 Hearing T. 147:6-16.

---

[1] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] Landscaping involves items such as shrubbery, mulch, and stone, while hardscaping mainly involves pavers.

Howard began constructing pools in 2001 or 2002, but did not receive any formal training until around 2010, at which point he began a training program that he referred to as "Pool School," during which he learned how to build pools using Spider Ties. Oct. 29 Hearing T. 148:1-24; 149:15-19. Spider Ties is a construction tool for building concrete walls and foundations for pools. Oct. 29 Hearing T. 148:1-24; 149:15-19. It is the method he used to construct the Foglers' pool.

Howard had constructed a handful of pools prior to meeting the Foglers, but only one of which was built using Spider Ties construction. Oct. 29 Hearing T. 150, 151; Nov. 5 Hearing T. 7-8, 93. That pool was constructed during Howard's participation in Pool School, run by Greg McDonagh ("McDonagh"), the owner of Spider Ties. Id. McDonagh personally trained Howard by having Howard build a pool using Spider Ties. Oct. 29 Hearing T. 150:1-22. Howard did not receive any form of certification to verify attendance and completion of Pool School but McDonagh did tell Howard that Howard did not need further training and McDonagh designated Howard's business as a preferred installer on the Spider Ties website. Oct. 29 Hearing T. 151:2-5. After learning how to construct pools using Spider Ties, Howard changed his business's name from "Nature Green Landscape Artistry" to "Hardscapes, Landscapes & Custom Pools by Nature Green" ("Nature Green"). Oct. 29 Hearing T. 151:12-16.[3]

Howard first met Mrs. Fogler at the Philadelphia Home Show (the "Home Show") in January 2012. Mrs. Fogler testified that Howard's display at the Home Show included

---

[3] The Foglers assert in their post-Trial Brief that Howard admitted he was inexperienced and therefore misrepresented his qualifications to the Foglers. In support, the Foglers quote Howard's testimony, "But truth be told is, I was—I was new to the industry . . ." but omit the context in which Howard made this statement. Howard's full statement was, "But truth be told is, I was—I was new to the industry, meaning I want this customer [the Foglers] to be happy." Oct. 29 Hearing T. 167:23-24. Though Howard may have been new to the industry, this statement, taken in context, does not necessarily contradict Howard's testimony regarding his experience installing pools. Howard could simultaneously have sufficient experience in constructing pools but also be new enough to the industry that he was concerned with establishing a strong reputation among customers.

photographs of, in her estimation, four to six pools that Howard represented that he had installed using Spider Ties. Nov. 11 Hearing T. 102:7-21. Howard does not recall meeting Mrs. Fogler at the Home Show or what the display included. Oct. 29 Hearing T. 152-153. No evidence was presented regarding whether the pictures were misrepresented to be Howard's work or that they were of work not completed by Howard.

Shortly after the Home Show, Howard met the Foglers at their house in Brigantine. Howard explained that he was experienced in installing pools using Spider Ties, licensed within the State and insured, and had been in business since the early 1990s. Oct. 29 Hearing T. 15:4-7, Nov. 5 Hearing T. 103:8-23. Mrs. Fogler testified that Howard represented that he had constructed many pools including pools for "lawyers, doctors and a judge," which Howard explicitly denies. Oct. 29 Hearing T. 153:12-14; Nov. 5 Hearing T. 103:19-21. The Foglers hired Howard not only to construct a pool, but also to hardscape and landscape the area surrounding the pool, with the expectation that the project would be completed by Memorial Day. See Contract from Nature Green (the "Contract"), Ex. P-6. The contract price was $53,800, and Howard insisted that this payment be made to him in cash installments. There is no evidence that the Foglers sought quotes or opinions from other contractors.

The Foglers highlighted various issues that arose from the inception of the project through the duration of the Foglers' employment of Howard and/or Nature Green. First, there is a dispute as to whether Howard or his then-wife, Pam Howard, signed the Contract and whether the Contract was signed in an individual capacity or on behalf of Nature Green. In his Answer, Howard admitted to signing the Contract himself, though in some of his pleadings, and during Trial, Howard asserted that he did not sign the Contract in his individual capacity but instead that his wife signed it on behalf of Nature Green. The signature on the Contract is illegible, but Nature Green's emblem is displayed in the header of the Contract. See Contract, Ex. P-6. The

Foglers insist that Howard never explained to them the existence of Nature Green and argue that there was never an explicit indication as to whether they contracted with Howard or Nature Green.  Regardless of who signed the Contract, there is no dispute that, generally speaking, Howard agreed to construct the pool for the Foglers and is the sole principal of Nature Green.[4]

The Foglers also stressed that Howard never presented proof of insurance or his contractor license; however, Howard testified that he was never asked by the Foglers for such documentation.  Oct. 29 Hearing T. 155:9-12.  As for whether he had insurance, Howard reiterated that his wife managed the administrative part of his business, that the company applied for its contractor's license annually, and that he has no reason to believe he was not insured at the time of constructing the pool.  Oct. 29 Hearing T 155:13-25.  Howard explained that documentation was unavailable because Nature Green generally did not maintain its records; the company shredded old documents regularly in order to maintain space.  Oct. 29 Hearing T. 156:1-13.  The notion that Howard cannot provide these documents is credible given that Nature Green was a small and unsophisticated business that is no longer in operation.

The Foglers have taken issue with the condition of the pavers Howard installed.  Howard's suppliers had a limited stock of the pavers originally agreed upon at the time the Contract was signed, so Howard and Mrs. Fogler agreed via email to a different brand.  See Ex. P-7, P-8.  The Foglers also sourced some of the pavers for the project themselves due to the limited supply of pavers.  Nov. 5 Hearing T. 31:18-25, 32:1-25, 33:1-9.  The pavers Howard was able to obtain had rust stains due to having been sitting in a warehouse with a band of steel around them for one to two years.  Nov. 5 Hearing T. 33:16-21.  Mrs. Fogler denied that the

---

[4] It is immaterial for the purposes of this decision whether Howard personally signed the Contract.  As explained below, regardless of whether he signed the Contract personally, Howard can be held personally liable for the actions he has taken while working with the Foglers as the principal of Nature Green.  Thus, the Court does not distinguish between the actions taken by Howard versus those taken by Nature Green because the end result is the same.

Foglers were aware of the weathered condition of the pavers despite Howard's testimony that he had relayed such information to Mrs. Fogler. Id.; Nov. 5 Hearing T. 107:17-25, 108:1-5. Mrs. Fogler insisted that she would not have agreed to the use of such weathered pavers. Nov. 5 Hearing T. 108:6-9.

Howard admitted that the pavers were weathered, rusty, and in poor condition at the time they were initially installed. Rather, Howard informed the Foglers—and insisted at trial—that he could make the pavers "look good as new" by acid washing them. Oct. 29 Hearing T. 44:18-25, 45:1-8. Howard made one attempt to acid wash the pavers but, according to the Foglers, that attempt was unsuccessful. Oct. 29 Hearing T. 45:15-24. The Foglers provided undated pictures of what appear to be stained and discolored pavers. Ex. P-26. Mrs. Fogler testified that the pictures were taken after Howard was no longer working on the project. Nov. 5 Hearing T. 111:22-24. Howard, on the other hand, insisted that he never would have left the job site with the pavers in a deficient condition. Oct. 29 Hearing T. 180:20-23; Nov. 5 Hearing T. 40:7-13. He testified that the Foglers never informed him that the pavers were still in poor condition, and that he could have made an additional attempt to acid wash them using stronger acid. Oct. 29 Hearing T. 179:20-25; 181:2-4. Howard added the Contract's warranties would have covered the pavers. Oct. 29 Hearing T. 180:24-25; 181:1-18. However, it is unclear whether the Foglers were ever made aware of said warranties. See Nov. 5 Hearing T. 51:1-25.

The parties initially agreed that Howard would install an Eastern vinyl fence. In fact, Howard provided the Foglers with a brochure of Eastern's fencing products. See Ex. P-1; Oct 29 Hearing T. 14:1-15:3. The Foglers provided no evidence that Howard intended to use a lesser quality fence at the time of contracting. However, Howard installed a different brand fence that he testified is of comparable quality and cost—and possibly slightly more expensive. Oct. 29 Hearing T. 182:7-184:23. According to Howard, the Eastern fences were on back order and

would not have been available by Memorial Day, so he discussed with Mrs. Fogler the proposition of purchasing a different brand fence sold at Lowe's. Id. Mrs. Fogler, allegedly, orally agreed to Howard purchasing the different fence as long as it looked the same as the Eastern fence, though no such agreement was reduced to writing. Id. Mrs. Fogler denied having such a conversation. Nov. 5 Hearing T. 106:17-107:6. That said, the only evidence the Foglers provided related to the value or quality of the fence was the assertion of Mrs. Fogler—an individual who is not in the business of installing or inspecting fences—that she could tell the fence was of inferior quality to the neighbor's supposedly high-quality fence by "knock[ing] around on it." Nov. 5 Hearing T. 116:17-117:2.

Another issue raised by the Foglers was whether Howard properly installed the fence gates. Howard admitted he initially installed the gates improperly, resulting in the gates failing a code of compliance requirement that they automatically swing closed. Oct. 29 Hearing T. 185:18-186:8. Howard asserted that any issues with the fence would have been covered under the general warranty; he asserts that despite attempting to obtain and install the correct pieces to fix the gate, he was not allowed back onto the Foglers' property to do so. Oct. 29 Hearing T. 184:21-23; 186:9-10.

Toward the end of Howard's employment by the Foglers, the parties feuded over the payments demanded by Howard. Around the time the parties entered into the Contract, Howard allegedly represented to the Foglers that while he would require payment in installments, he would not demand 95% of payment without having completed 95% of the project. Though it is unclear if Howard ever made such a promise personally, that same promise was made by Pam Howard in an email she had sent to the Foglers around the time the Contract was signed. The email reads:

> We won't ask for the 5% payment until there is only $2560 value left of your job….[sic] in other words, we wont [sic] be asking for your 45% payment until 95% of the work is completed……[sic]

> typically, the final 5% payment comes due within a day or two of
> the ¾ completion payment…[sic] <u>We won't hold more than the
> value of work that remains to be done.</u>

Ex. P-3 (emphasis added).  While this email conflicted with the payment schedule detailed in the

draft Contract, which called for 95% of the Contract price to be paid when 75% of the work was

completed, the final Contract included hand-written edits detailing the payment schedule

outlined in the above email.  Ex. P-6.

The discrepancy between the draft Contract and the payment schedule detailed in the

email and signed Contract ultimately led to frustrations between Mr. Fogler and Howard when

Howard demanded the third installment, which brought Mr. Fogler's total payments to 95% of

the purchase price before having completed 95% of the project.  Presumably, Howard believed

he had completed 75% of the work and was entitled to be paid 95% of the Contract price as

called for in the draft Contract.  There is no meaningful evidence that Howard had not completed

75% of the work at that time.  Mr. Fogler confronted Howard with the email, at which time

Howard still demanded payment despite sympathizing with Mr. Fogler's position.  Oct. 29

Hearing T. 57:1-16.  Howard allegedly threatened to abandon the project if payment was not

made.

Because he was personally unaware of other contractors who could complete the job, Mr.

Fogler compromised by paying Howard approximately $20,000 of the approximately $25,000

being demanded, withholding funds until additional work had been completed.  Oct. 29 Hearing

T. 57:1-58:25.  As discussed below, Mr. Fogler eventually paid the remaining $5,000 to Howard

despite believing multiple items still needed to be completed, including granite countertops,

plasterwork, and obtaining inspection approvals.  Oct. 29 Hearing T. 56:22-25.  Regardless,

tensions between the parties remained exceptionally high from the point of this payment dispute

through the end of Howard's employment by the Foglers.

Ultimately, Howard received a letter from Mr. Fogler dated June 11, 2012, written in a legal manner and tone, informing Howard that he was no longer allowed on the property.  See Ex. P-21.  The letter details how Howard had initially promised to finish the job by late April, how Howard represented he had three days' of work left as of May 2, and how the project had still not been completed as of June 11.  Ex. P-21.

Though the letter mentions other issues, it came following Howard's inability to finish the plasterwork.  See Ex. P-21; Nov. 5 Hearing T. 48:1-25, 49:1-25.  There were multiple stages to applying the plaster—a patch, a base, and then the plaster.  Oct. 29 Hearing T. 197:10-19.  Howard testified that his ability to finish the plasterwork was impeded by inclement weather, though neither party presented testimony as to which dates the inclement weather occurred.  The first coat of plaster began to scale due to wet conditions from rain.  Nov. 5 Hearing T. 60:5-25.  Similarly, Howard never finished the second coat due to rain.  Id.  Though Howard's answers to interrogatories indicate that he had put two coats down and thought he was finished and only found out that there was still plasterwork to be completed after receiving a text from Mrs. Fogler about a small area that was scaling, his testimony was that he knew the plasterwork was not finished.  Nov. 5 Hearing T. 66–67.  Regardless, Howard testified that filling the pool before finishing the plasterwork would result in leaking.  Nov. 5 Hearing T. 99:1-5.

Mr. Fogler was aware that, at the time he banned Howard from the property, there was still work to be completed, including finishing the plasterwork.  Oct. 29 Hearing T. 119:12-21.  Despite knowing the plasterwork was incomplete, the Foglers filled the pool, and the pool leaked.  Oct. 29 Hearing T. 113:3-15.  The Foglers assert that a June 5 email from Howard misled them into thinking the majority of the plastering was finished and that the pool was therefore predominantly ready for use. That email stated that he still had to "patch the plaster by the bar," and the bar only constituted a small section of the pool.  According to the Foglers, the

9

fact that the June 5 email only explicitly mentions patching the plaster and sand-locking the pavers as outstanding tasks despite there being multiple other incomplete items at the time indicates that Howard never intended to complete all of the work for which he was hired.

The Foglers made the final payment under protest due to the alleged deficiencies in Howard's work.  Though not every issue is detailed in the letter, as of Howard's final day on the job there were still multiple issues outstanding beyond the aforementioned issues, including: the Foglers purchased, on their own, a granite countertop that was included in the Contract price during the project due to concerns over delays and were never credited for that purchase; the in-ground cooler Howard installed had rusted out; the underwater lights installed by Howard leaked; and Howard's electrical subcontractor installed the wrong transformer.  Howard testified that he only learned about many of these issues after being banned from the property.  He explained that he was never approached for a credit on the granite countertop, he was never approached about the lights not working, and he was never informed that the wrong transformer was installed.  Oct. 29 Hearing T. 191:9-25.  He also testified that the lights did not work because of a manufacturing defect he discovered only after he was banned from the property.  As for the cooler, he noted that nowhere in the Contract or its addendum is a cooler included, but nevertheless he installed it at the Foglers' request.  Moreover, although he did not know it would rust, the general warranty covers all work for one year.

By letter dated June 22, Howard responded to the Foglers' June 11 letter, stating that weather impeded his ability to finish plastering and that he was still willing to come to the property to finish the project.  Ex. P-22 (the "June 22 Letter").  However, the Foglers ultimately engaged another contractor to finish the job.

After Howard filed his Chapter 13 petition, the Foglers filed the Complaint.  The Foglers seek damages totaling $60,739—the contract price of the replacement work.  The Foglers assert

that this amount should be trebled under the CFA to a total of $182,217.  The Foglers also seek

attorney's fees and costs.  Thus, they have filed a wholly unsecured proof of claim for

approximately $190,000, to which any objections by Howard have been resolved.

## DISCUSSION

### A. Credibility of the Parties

The Foglers' case is premised upon the Court finding Howard's testimony incredible,

considering the factual allegations that would be most significant to a finding that Howard made

misrepresentations are in dispute.  Moreover, the underlying point of the Foglers' case—and any

fraud case—is that the defendant deceived the plaintiffs throughout their dealings together.

The Foglers' post-trial brief highlights some specific instances from which they argue the

Court can conclude that Howard is not credible.  However, many of the Foglers' examples quote

Howard's testimony out of context.  The Foglers assert that Howard provided contradicting

testimony regarding the pavers, initially admitting they were weathered only to later deny that

they were weathered.  Howard's full quote was, "they were weathered, older pavers.  They

looked beautiful, but there was a couple of them that weren't going to match . . . ."  Oct. 29

Hearing T. 161:13-14.  Also, while he does appear to deny that the pavers were "old and

weathered" in his later testimony, Howard continued to describe the pavers as being discolored

and requiring cleaning.  Nov. 5 Hearing T. 37:16-24, 38:13-24 ("[T]hey looked okay . . . they

had rust . . . I told her I would pressure wash them . . . .").  Howard maintained that he could

clean the pavers by pressure washing them and using stain remover.  Nov. 5 Hearing T. 38:22-

24.

The Foglers also note some seemingly inconsistent descriptions regarding the status of

the plasterwork, arguing that Howard's testimony about various stages of the process was

inconsistent with the content of Howard's final letter sent to the Foglers.  In his June 11 Letter,

Howard stated that he thought he was finished until he received notice from Mrs. Fogler that a

small area by the bar was scaling, however he testified that he knew all along some additional

patching and plastering would be needed.  On its own, this one line from the letter seems

inconsistent, but the remainder of the letter details how the weather inhibited the ability to

successfully finish the plastering.  The Court considers Howard's statement in the context of the

entire letter and surrounding circumstances at the time rather than on its own.  There were

multiple steps involved in adequately plastering the pool, and the parties do not dispute that

Howard made at least one attempt to plaster the pool and that the initial attempt was

unsuccessful, causing the pool to require extra attention.

      The Foglers argue that Howard contradicted himself because his interrogatories state that

the transformer was properly installed, but testified otherwise.  Howard explained at trial that the

transformer was properly installed, but the wrong transformer was installed.  Nov. 5 Hearing T.

87:1-10.  Regardless, Howard did not install the transformer; it was installed by a subcontractor

and the Foglers knew this.  Oct. 29 Hearing T. 177:4-9.

      Also, Howard's testimony that the Foglers might have been able to fill their pool to check

whether all the items in the pool were in working condition within an hour of him finishing

plastering the pool was not necessarily contradictory to his testimony regarding plastering in

poor weather.  Howard repeatedly testified that he would not plaster the pool when there was a

threat of rain within a 24-hour period.  Although the plaster takes only a handful of hours to dry,

Howard could not have known for certain when it would rain.  It is reasonable that he opted to

avoid any rain-related issues when the forecast called for the possibility of rain on a given day.

      The Foglers also aver that Howard was not honest when he testified that he was willing to

repair the fence because Howard's June 5 letter to the Foglers did not mention the fence gate as

an outstanding issue and the June 22 Letter to the Foglers denied any responsibility for fixing the

fence gate. Howard's failure to list each and every outstanding item—such as a minor fixing of the fence gate—does not necessarily mean he lied when he stated that he would have fixed the gate if he were given the opportunity. Moreover, it is not surprising that the tone of the June 22 Letter would be different than his testimony, considering Howard sent the letter in response to the Foglers' June 11 letter in which they revoked Howard's access to their property and explicitly reserved all rights against him.

Even though the Court rejects the Foglers' argument that Howard was incredible, the Court acknowledges that Howard's testimony and certifications were inconsistent at times, including: (a) a certification dated November 24, 2014 that he first learned of the Foglers' dissatisfaction when they filed their Complaint; (b) admitting then denying that he signed the Contract in his individual capacity as "Nature Green Representative;" and (c) Howard's confusion at trial as to whether he had responded to a particular set of emails, initially denying that he would have seen an email sent to Nature Green's account before realizing he had in fact seen, and responded to, one of the emails sent to that account. Nov. 5 Hearing T. 54:25-58:3. The Foglers highlighted various areas where Howard was confused during his testimony, but to elevate those instances into a general assumption that nothing Howard said can be trusted, thereby facilitating a finding of fraudulent behavior, is unwarranted. At no time did the Court believe that Howard was trying to dodge questions or provide untruthful answers. To the contrary, the Court found Howard to be credible.

Mrs. Fogler and Mr. Fogler—an experienced construction litigation attorney—were dealing with an unsophisticated owner of a small business. The situation between the parties took a litigious tone sometime around May 2012, and while Howard might not have maintained the best records or had a perfect memory of each step in the process of working on the property, the Foglers appear to have been preparing for litigation before Howard had finished working on

their property.  Where Howard was writing casual email responses to the Foglers, the Foglers were responding with sophisticated letters containing language often used in anticipation of litigation, such as reservations of rights.  This is not to say that the Foglers were unjustified in their actions, but to note that the Foglers likely realized they may be headed toward litigation long before Howard.

This point was apparent during trial, as Howard was confused and provided some seemingly inconsistent testimony.  The Court never felt Howard was lying—he was simply struggling to answer the questions as asked.  It appeared during trial that Mr. Fogler (who conducted the cross-examination of Howard) was attempting to "trip-up" Howard.  At one point during cross examination, Howard admitted to Mr. Fogler that he was confused as to the factual direction of Mr. Fogler's questioning, to which Mr. Fogler responded, "[t]he beauty of today, for you, Mr. Howard, is you don't have to know where I'm going, you just have to answer the questions."  Nov. 5 Hearing T. 16:2-9.  Though Mr. Fogler did clarify his question shortly afterward, it added to the appearance that he was making a calculated—and effective—effort to confuse Howard.

There were also instances where the Foglers' testimony seemed questionable, such as when: (a) Mrs. Fogler stated that she <u>knew</u> the fence that was used was of inferior quality by knocking on it; (b) the Foglers testified that the pool "wasn't anywhere near 95 percent done" despite at the same time thinking that the pool was ready to be filled; or (c) Mr. Fogler testified that he had no knowledge that he may have been hiring a business entity despite being an experienced construction attorney and the Contract displaying Nature Green's name in the heading and the signature line stating, "Nature Green Representative."  Oct. 29 Hearing T. 24:1-18.

A handful of inconsistencies does not negate a witness's honesty altogether.  The Court will not make the philosophical leap that the existence of certain inconsistencies in testimonies of either party related to events from over three years ago necessarily mean that the entire essence of a witness's character is that of a liar.

### B. Howard's Potential Personal Liability

Howard argued that he cannot be personally liable because the Contract was between the Foglers and a corporate entity.  There is a dispute as to whether the Foglers contracted with Nature Green or Howard, however an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable for said tort.  See Zubik v. Zubik, 384 F.2d 267, 275 (3d Cir. 1967); Saltiel v. GSI Consultants, Inc., 170 N.J 268, 303 (2002) ("[A] corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort.").

Whether the Contract was signed by Nature Green or Howard, nearly every other relevant fact involves actions taken by Howard.  If a fraud occurred, Howard was sufficiently involved in the commission of that fraud that he could be personally liable.

### C. Common Law Fraud, CFA, and Nondischargeability Under § 523(a)(2)(A)

The Foglers have asserted three fraud-based counts: common law fraud, violation of the New Jersey Consumer Fraud Act, and nondischargeability under § 523(a)(2)(A)—which excepts from discharge any debt obtained via "false pretenses, a false representation, or actual fraud.  Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors."  In re Jacobs,381 B.R. 128, 136 (Bankr. E.D. Pa. 2008).  Excepting a debt from discharge under § 523(a)(2)(A) and proving common law fraud both require satisfaction of essentially the same five elements: (1) a material misrepresentation; (2) knowledge of its falsity; (3) the intent to deceive; (4) justifiable reliance; and (5) proximately caused damages.  In re

Cohen, 185 B.R. 180, 186 (Bankr. D.N.J. 1995), aff'd 191 B.R. 599 (D.N.J. 1996), aff'd, 106

F.3d 52 (3d Cir. 1997), aff'd sub nom. Cohen v. de la Cruz, 523 U.S. 213 (1998) (providing

elements under § 523(a)(2)(A)); see also SG Homes Associates, LP v. Marinucci, 718 F.3d 327,

334 (4th Cir. 2013) (providing elements of common law fraud); In re Gay, 537 B.R. 208, 212

(Bankr. E.D. Pa. 2015) (noting that prevailing on a § 523(a)(2)(A) action requires proving each

of the five elements of common law fraud).  Common law fraud must be proven by clear and

convincing evidence under New Jersey law—see Stochastic Decisions, Inc. v. DiDomenico, 236

N.J. Super. 388, 395 (App. Div. 1989)—while § 523(a)(2)(A) actions must only be proven by a

preponderance of the evidence.  Cohen, 185 B.R. at 186.

The Foglers' argument regarding liability under the CFA similarly requires a finding of

fraud.  Thus, the ultimate success of each of the fraud-based counts is dependent on whether the

Foglers have established all of the elements of § 523(a)(2)(A).  Because the burden of proof

required by § 523(a)(2)(A) is lower than the clear and convincing standard applicable to common

law fraud, the Court will assess whether the Foglers proved each element by a preponderance of

the evidence.

## 1. Material Misrepresentation

Establishing a material misrepresentation requires more than merely a showing of

nonperformance on a promise made to the plaintiff.  Automated Salvage Transport, Inc. v. NV

Koninklijke KNP BT, 106 F. Supp. 2d 606, 623 (D.N.J. 1999).  However, if "a promise is given

and the promisor knows at the time of promising that he has no intention of fulfilling it, the

promise will constitute a [material misrepresentation]."  Id. (quoting Lo Bosco v. Kure

Engineering Ltd., 891 F. Supp. 1020, 1031 (D.N.J. 1995)).

Plaintiffs generally can establish a contractor-debtor's fraud or misrepresentation in one

of two ways: (1) proving the contractor entered into the contract without ever intending to

16

comply therewith, or (2) proving the contractor intentionally misrepresented a material fact or qualification at the time he solicited the plaintiff's business.  In re Purington, 2012 WL 1945510, *10 (Bankr. D.N.J. May 30, 2012) (West).  "In the absence of something more, poor quality workmanship does not equate with a misrepresentation."  Id. (collecting cases).  Multiple cases across various jurisdictions support this notion.  See In re Wiszniewski, 2010 WL 3488960, *6-7 (Bankr. N.D. Ill. Aug. 31, 2010) (contractor who installed substandard flooring rather than the flooring agreed upon constitutes merely a "broken promise" that could lead to a breach of contract claim rather than a fraudulent misrepresentation); In re Horton, 372 B.R. 349, 358 (Bankr. W.D. Ky. 2007) (refusing to equate "proof of the performance of substandard work with proof of fraudulent intent").

The Foglers highlighted the following general alleged misrepresentations: that Howard lacked insurance, that Howard misrepresented his experience, that Howard intentionally demanded payments early, that Howard performed a "bait-and-switch" regarding the materials to be used, and that Howard never intended to complete the project.  Though there are multiple, potentially legitimate allegations of substandard work by Howard, there is little evidence that Howard entered into the Contract without intending to comply with its terms or that he intentionally misrepresented a material fact or qualification at the time he solicited the Foglers' business.  Howard may have done a poor job constructing the pool and ancillary items, but poor construction does not prove that Howard misrepresented his ability or intention to do the work.

Howard testified that he was never asked at the time of contracting for proof of insurance. Moreover, the Foglers did not establish that it was material to them that Howard was insured. Howard asserts that his ex-wife handled the administrative aspects of his business and that he was generally unaware of the specifics as to where proof of insurance would be located, but has no reason to believe that he was not insured at the time.  Oct. 29 Hearing T. 155:8-19.

According to Howard, he would periodically shred dated documents to save storage space.  Oct. 29 Hearing T. 156:10-13.  Considering Howard is a bankrupt Debtor with a now-closed small business, it is not out of the realm of possibility that he would have difficulty producing proof of insurance for 2012 even if he was insured at the time.  For this reason, the Foglers have not satisfied the Court that Howard misrepresented the fact that he was insured, or that any such misrepresentation was material.

The Court is also unconvinced that Howard misrepresented his experience.  Mrs. Fogler testified that Howard displayed four to six pictures of pools that he claimed to have constructed using Spider Ties at the Home Show and that he erroneously told Mrs. Fogler he had built multiple pools for "lawyers, doctors, and a judge."  Given Howard's denial that he made the statement about building multiple pools for various professionals, it is difficult for the Court to place significant evidentiary weight on the possibility that the statement was made.

Also, though he does not recall specifically if pictures were on his display at the Home Show, Howard mentioned that he provides pamphlets regarding Spider Ties.  Moreover, Mrs. Fogler acknowledged that Howard's display at the Home Show was also aimed toward promoting his hardscaping and landscaping work with which he has extensive experience.  The Foglers hired Howard because of his ability to do that work as well.  The fact that Howard may have had multiple pictures of pools, landscaping, and hardscaping does not necessarily mean he misrepresented his experience at the Home Show.  Howard has never denied being new to the pool industry, which reduces the debate over whether Howard overtly misrepresented his experience to the Foglers as a classic he-said, she-said dispute and based on the evidence before the Court, the Foglers have not satisfied their burden of proof on this element.

Moreover, there is little evidence presented to show that Howard was incapable of building a Spider Ties pool.  Howard was trained in the use of Spider Ties by the owner of

Spider Ties and he had installed other types of pools.  The pool Howard eventually constructed for the Foglers had malfunctioning lights (caused by a manufacturing problem, not Howard) and Howard failed to finish plastering the pool (at least in part because he was removed from the property).  Beyond that, he nearly completed constructing the pool.  Thus, there is little evidence that Howard's representation that he was capable of building a pool using Spider Ties was false.

Many of the issues highlighted by the Foglers deal with items beyond the pool itself, such as the bar top, the pavers, and the fencing.  Howard's testimony was that he has extensive experience has a hardscaper and landscaper—there is no evidence that Howard misrepresented his experience with respect to these items.

As the aforementioned case law states, the fact that Howard may have provided substandard performance on the contract may constitute a breach of contract, but it does not rise to the level of fraud.  Howard may have failed to properly plaster the pool, provide sufficient pavers or clean those pavers, provide the granite bar top, or properly install the fence, gates, lights, and cooler—but this does not mean Howard made a material misrepresentation regarding his ability or intention to complete the project at the time he promised to do so.  As explained above, the Foglers did not meet their burden of proof that Howard misrepresented his ability to complete the project.  Also, the Foglers did not meet their burden of proof that Howard had no intention of completing the project at the time he contracted with the Foglers; he physically worked on the project for nearly two months, and the evidence indicates that he intended to remedy outstanding issues until the day the Foglers denied him access to the property.

As for allegations regarding a bait-and-switch, the use of each of the substituted materials was adequately explained by Howard.  For example, the weathered pavers were used as a result of limited supply.  Howard made an attempt to clean the pavers, and stated that he could have made additional attempts to clean the pavers that may have been successful.

Similarly, there is no evidence that, at the time Howard contracted with the Foglers, he knowingly misrepresented the brand of fence he planned on using.  He did not promise to provide an Eastern fence at the outset without ever intending to make good on that promise.  Rather, Howard explained that the Eastern vinyl fencing was on back order and Howard allegedly discussed using a different fence with Mrs. Fogler.  The lack of documentation does not necessarily prove that this discussion never occurred—it is quite conceivable that a small business such as Nature Green would not necessarily document every on-the-job change during a construction project.  In fact, during this very same project the Foglers asked for—and Howard agreed to install—a built-in cooler, but there is no documentation or record of this addition either.  Moreover, even if the Court accepts Mrs. Fogler's testimony that such a conversation never happened, the only evidence provided by the Foglers that they were slighted by this substitution was that Mrs. Fogler could tell the fence that was used was of lesser quality by knocking on it.  This does not meet the Foglers' evidentiary burden, and Howard testified that the fence used was of similar quality and cost to the Eastern fence originally agreed upon.

Demanding payment early is also not necessarily indicative of a fraudulent misrepresentation.  It appears Howard demanded payment when 75% of the work was completed rather than at the agreed-upon point of 95% completion, and that his doing so may have been a breach of the Contract.  But that is all it was—at best, a breach of the Contract.  While evidence was presented regarding various deficiencies in the work provided by Howard, there is no meaningful evidence that the work was not predominantly completed at the time Howard demanded payment.  Based on the testimony, the Court believes that Howard planned on finishing the job at the time he entered into the Contract.  At the time of the payment dispute and ultimately by the time he was removed from the job, Howard had dug out the location for the pool, built the vast majority of the pool and installed pavers, lights, fencing, and the bar top.

Taking all of these steps and working at the job site for approximately two months supports Howard's testimony that he intended to complete the Contract. This is not a case where a defendant took the money and ran.

Despite possible shortfalls in quality, Howard completed the majority of the Contract, making it inconceivable that he entered into the Contract without intending to follow through. The Foglers have argued that Howard's emailed punch list's failure to include all outstanding items indicates that he never intended to finish the job. The Court is not persuaded by this argument. Howard has admitted to not being particularly email-savvy, and it is also understandable that a contractor's punch-list to a client may be unintentionally incomplete.

That is one of the reasons why the client typically sends a punch list of outstanding items to the contractor after the contractor has indicated he is near finished with a given project. In this case, Mr. Fogler had a mental list of items that he believed Howard still needed to complete, but rather than present this list to Howard, he chose to gauge whether Howard was aware of each of those items and asked Howard to provide a list. Howard testified that the Foglers never confronted him regarding multiple issues—such as those involving the granite bar top, the lights, and the transformer—until after he had been removed from the property. In fact, after Mr. Fogler informed Howard he was no longer allowed on the property, Howard wrote back that he was still willing and able to return to remedy the remaining issues of which he was aware at the time, specifically, to finish the plasterwork. Based on the above, the Court determines that Howard intended to comply with the Contract.

For these reasons, the Foglers have failed to prove by a preponderance of the evidence that Howard made a material misrepresentation. The Foglers have not established that Howard misrepresented his ability nor have they established that he entered the Contract never intending to comply with it. This case involves, at its core, a contractor with extensive experience in

landscaping and hardscaping and relatively less experience constructing pools, specifically using Spider Ties construction.  It involves misunderstandings at the outset and inducement of the Contract that resulted in frustrations between the parties as the project progressed.  Howard made various oversights and missteps in physically carrying out the terms of the Contract, as he may have failed to: (a) properly install the gates to the fencing, (b) source presentable pavers, (c) finish plastering the pool, and (d) complete the project by Memorial Day.  None of this is disputed.  However, none of this rises to the level of a fraudulent misrepresentation.  At its core, this is no more than a breach of contract case.

Accordingly, the Court does not find Howard's debt to the Foglers to be nondischargeable under § 523(a)(2)(A) and, for the same reasons, the Court does not find Howard liable for common law fraud or fraud under the CFA.

## 2. Knowledge of its Falsity

Even if, hypothetically, the Court were to find that Howard made misrepresentations, the Foglers would need to show the Court by a preponderance of the evidence that Howard had knowledge that those representations were false.  The Foglers did not meet that burden.  Knowledge of a representation's falsity, along with intent to deceive, can generally be inferred from the totality of the circumstances and the defendant's reckless disregard for the truth.  In re Cohen, 191 B.R. 599, 605 (D.N.J. 1996) (citation omitted).

There is undisputed testimony that Howard was trained by the owner of Spider Ties as part of the Pool School program.  Howard testified that although he never received a certification from McDonagh, he was listed as a preferred installer of pools on the Spider Ties website after training directly with McDonagh.  Howard truly believed he could install pools using Spider Ties after having received this training.  Even if this belief was not true, Howard did not have the requisite knowledge of the falsity of his representations.

As for the other aspects of this case, Howard's extensive experience in landscaping and hardscaping is not in dispute.  Howard's work on the project also shows that he intended to complete the project when the parties entered into the Contract.  To the extent Howard represented that he had extensive experience in landscaping or hardscaping or that he intended to complete the project, such representations have not been proven to be false, so it would be impossible for Howard to have knowledge of their falsity.  The Foglers' case must fail for this additional reason.

### 3. Intent to Deceive

Having determined that Howard did not make a knowing misrepresentation, the Court can only conclude that Howard did not intend to deceive the Foglers.  Howard promised to build a pool and provide hardscaping and landscaping surrounding the pool.  Despite being an experienced landscaper and hardscaper and having gone through Pool School, Howard did not complete the Contract to the Foglers' satisfaction.  The mere fact that the work was not satisfactory does not warrant a conclusion that Howard intended to deceive the Foglers at the outset.  Therefore, the Foglers failed to meet their burden of proof on this element as well.

### 4. Justifiable Reliance

Reliance must be both actual and justified.  In re Kroen, 280 B.R. 347, 351 (Bankr. D.N.J. 2002).  Such reliance need not be reasonable—only justifiable.  In re Scott, 294 B.R. 620, 628 (Bankr. W.D. Pa. 2003).  "It is only where, under the circumstances, the facts should be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance, or [the plaintiff] has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."  Field v. Mans, 516 U.S. 59, 71-72, 116 S. Ct. 437, 444 (1995) (quoting W. PROSSER, LAW OF TORTS § 108, p. 718 (4th ed. 1971)).  In other words, reliance can be justifiable even if an investigation would have uncovered the

alleged falsity of the defendant's representations.  <u>Scott</u>, 294 B.R. at 628.  However, in general, "[o]ne must use his senses and cannot recover if he blindly relies on a misrepresentation whose falsity would be patent to him if he utilized the opportunity to make a cursory examination or investigation."  <u>Id.</u> at 629.

The evidence before the Court is that Mrs. Fogler briefly met Howard at a home show, Howard came to the Foglers' residence to make his sales pitch and sketch a plan for their property, and then, after some negotiation over the timing of payments, the Foglers hired Howard.  There is no evidence that the Foglers asked Howard for references or sought quotes or opinions from other contractors.  In fact, Mr. Fogler testified that, at the time of the payment dispute, he did not know of any other "pool guys."  Though a cursory examination may not have necessarily avoided the issues before the Court, the Foglers simply relied on Howard without making any investigation at all.   Thus, the Court cannot find that there was justifiable reliance in this case.

### 5. Damages

Even if the Foglers had satisfied their burden of proof with respect to the other elements, there are issues regarding their asserted damages.  First, the Foglers filled their pool knowing that the plasterwork was not completed, which caused the leaking.  Second, and most notably, the Foglers seek damages of $60,739 because that was the amount paid to another contractor to remedy the alleged deficiencies left by Howard after the Foglers banned Howard from the property.  The Foglers failed to establish the extent to which they were harmed by Howard.  The amount paid to the next contractor included items that were not included in the Contract— specifically, a heater and an auto-fill system.  To the extent the $60,739 was payment for those additions, the damages do not reflect the alleged damages caused by Howard.

### D. Nondischargeability Pursuant to § 523(a)(6)

The Code excepts from discharge those debts that are "for willful and malicious injury by the debtor . . . ." 11 U.S.C. § 523(a)(6).  Just as is the case with § 523(a)(2)(A), those seeking a determination of nondischargeability under § 523(a)(6) must do so by a preponderance of the evidence.  In re Jacobs, 381 B.R. at 136.  The Foglers' only argument for nondischargeability under this section is that Howard's fraudulent conduct can be construed as willful and malicious conduct for the purposes of § 523(a)(6).  Although fraudulent activity can give rise to nondischargeability for willful and malicious injury, see In re Iommazzo, 149 B.R. 767, 772 (Bankr. D.N.J. 1993), because the Court did not find any fraudulent activity committed by Howard, the Foglers' § 523(a)(6) count must necessarily fail as well.

### E. Breach of Contract

The Foglers did not address breach of contract in their post-trial brief.  Moreover, the parties have already consented to the Foglers' unsecured claim in Howard's main bankruptcy case and, even if the Foglers were successful on their breach of contract count, the resulting judgment would be dischargeable.  Accordingly, the Court finds that the Breach of Contract Count is moot.

### CONCLUSION

For the foregoing reasons, the Court finds in favor of the Defendant, Howard, with respect to Counts I, II, III, and IV, and dismisses Count V as moot because breach of contract cannot be a basis for nondischargeability and the amount of the Foglers' Proof of Claim has been resolved.  A Judgment reflecting this decision will be docketed by the Court.


Dated:  August 25, 2016                      _____
                                             JERROLD N. POSLUSNY, JR.
                                             U.S. BANKRUPTCY COURT JUDGE